Thank you, ma'am. Miss Perloff Giles, am I pronouncing your name right? Perfectly, thank you. It's a lot easier than that last guy. Anyway, you have ten minutes total, but you've got two minutes of rebuttal that you've reserved. So that gives you eight minutes now. You may proceed. Thank you, Your Honor. And may it please the Court, Alexandra Perloff Giles from Gibson, Dunn & Crutcher, on behalf of the petitioner Jean-René Auguste, Jr. This case comes before this Court in a highly unusual posture. The immigration judge, not once but twice, made factual findings that Mr. Auguste is likely to face torture if he is forced to return to Haiti based on a confluence of factors, including his severe mental illness, his status as a criminal deportee with drug-related convictions, and the fact that he's highly Americanized, doesn't speak French or Creole, and has no family in Haiti. The BIA ignored the IJ's factual findings, nonetheless, and substituted its own. The BIA's decision suffers from two legal errors, either one of which we think warrants remand. First, the BIA failed to apply the proper standard for assessing the likelihood of torture under CAT. And second, the BIA failed to apply the required clearly erroneous standard to the IJ's factual findings. The IJ's determination that Mr. Auguste is both likely to be detained and likely to face torture in detention is amply supported by the record and we believe should be reinstated. So I'll begin with the first, the BIA's impossibly high standard for assessing likelihood of torture. As your honors well know, under the Convention Against Torture, the petitioner has to show that it is more likely than not. The BIA used that very phrase multiple times. Certainly. The BIA parroted the correct standard in certain places, but it didn't actually apply it. So I think the government tries to rehabilitate the BIA's decision by framing it as just a question of word choice when the BIA said that it has to be the ineluctable conclusion or inevitable conclusion that he will face torture. But I think this problem infects the BIA's analysis where they look to whether there are, quote, any other possible outcomes that may arise. In other words, if there's any world in which Mr. Auguste somehow has all of his mental illnesses perfectly treated or happens to evade any encounter with law enforcement, then he's not entitled to protection. And that's just not the standard under CAT as this court has held, for example, in a charge. I don't know. It seems to me the IJ, according to the BIA, the IJ committed error by stringing together a series of suppositions which the BIA found that any one of which was not more likely than not to occur, but certainly not all of them together was more than likely not to occur. So why isn't that the proper standard? So a couple of points on that, Your Honor. First, I think the BIA mischaracterizes the chain of suppositions, making it out to be much longer than it is. Essentially, it's a two-part chain. Is he likely to be detained when he is returned? And is he likely to face torture in detention? But with respect to the BIA's application of the wrong CAT standard in its- On his predilection to resist, physically resist authority. So that is something that would result in additional sanctions. So I think there are- I think you've got about three, three more likely than nots, which could work out to like one in five or one in ten. I think Mr. Auguste is at risk based on a number of factors. And under this Court's decision in Hamilton v. Whitaker, you look to the aggregate of all of those factors. So among those are the manifestations of his mental illness that Your Honor is referencing that caused him to have, quote, violent outbursts, confrontations with authority figures. There's also the fact that he has no family in Haiti. The Ninth Circuit's decision in Rador v. Holder suggested that that alone might be grounds for finding torture in Haiti. Not having family, how does that result in torture? My understanding of the case is that it's the conditions of confinement that amount to torture for someone who has these disabilities. And that if you have family, they might be able to buy you out. That's right, but it goes to specific intent in that they're intentionally keeping people and a system of corruption that correctional officers and police officials are paid by family members. And if you don't have family members, you might not get out. But to go back to- But you just mentioned specific intent. Isn't it your burden to show that the government has specific intent to torture your client? Or has specific intent not to interfere with people who are doing it? Certainly before the immigration judge, I think before this court, our burden is to show that the BIA erred in finding that the IJ's factual findings that it was required to defer to were clearly erroneous. Well, then what are the findings that establish specific intent? So the record is replete with evidence in both the U.S. State Department- That should be very easy for you to answer the question. So, for example, at record 389, many mentally ill individuals end up in Haiti's prison system. Then it goes on to talk about others ending up in mental health institutions. At record 381, correctional officers- Well, what should be a problem if people who are mentally ill end up in mental hospitals? That's what you just said. Well, and the treatment in mental hospitals, they go on to say, amounts to torture. But the first part is that many, indeed, the immigration judge found most in Mr. Auguste's position, will end up in detention. And under Your Honor's decision in Pierre v. Gonzalez, it's important that we look to the case-by-case circumstances. So this is not a case like matter of JE or indeed Pierre where the issue was the generalized prison conditions. And I think a comparison to Pierre is indeed useful. In that case, the petitioner had diabetes and he had family in Haiti who was going to be able to administer the medication. There's no- Well, so what I was going to ask is that how much of this is just reweighing the evidence? I mean, I'm seeing things like being forcibly injected with psychotropic drugs, more likely to suffer violence at the hands of the national police, more likely to be detained because of their perception, more likely to be targeted as X. I'm seeing a lot of more likely, more likely, more likely, more likely. And certainly other possibilities, doesn't defeat a more likely. But what I'm hoping that you can explain is when is something establishing the insufficiency of the evidence versus deciding, versus reweighing or redoing de novo review? So I think under this court's holding in De La Rosa versus Holder, as long as the IJ's factual findings are plausible under the record, the BIA may not make factual determinations that are at odds with those findings. And specific intent is a factual finding. As is a prediction of the likelihood of future torture under Huilin Huang versus Holder. Those kinds of assessments about the likelihood of a future persecution or torture are themselves factual findings of the BIA. So in those cases when it's factual finding, it's not that is there another alternative? Because when you have to weigh two plausible ones, we defer to the IJ. Or the BIA was supposed to defer to the IJ. That's right. And I think to the extent there's any, you know, there may be two plausible readings of the country conditions evidence, the IJ's controls, the IJ found that he was likely to be detained based again on all of these risk factors and that he was likely to face the torture intent in. Well, the BIA, at least with respect to access to medical care, concluded that the IJ's findings were conclusory. That the IJ made no specific findings about the particular treatment that the petitioner would need or his access to that in Haiti. Why isn't that fair assessment by the BIA? So I think the BIA was ignoring substantial amounts of record evidence, including his testimony that he was allergic to one antipsychotic medication that he was prescribed. Others made him drowsy. And so even in this country, there isn't some sort of silver bullet to treat his many, many mental illnesses. He's more recently been diagnosed with schizophrenia. And the country conditions are replete with evidence that in Haiti, the likelihood of him obtaining adequate medical care to address all these is non-existent. But more importantly, the BIA entirely decontextualized record evidence about the availability of medical care. So, for example, there's evidence that there are only 10 psychiatrists in Haiti for a population of 10 million. On that basis, the IJ concluded he was unlikely to obtain medical care. And the BIA blithely stated there are psychiatrists in Haiti. And that is... And he actually needed 16 referrals, right? So he needed six more referrals than there were providers to give to him, right? That's right. And he is undergoing therapy, so it's inaccurate that he's not currently receiving any medical care. I see my time has elapsed, unless the court has further questions. Well, you've got two minutes to revert. Thank you very much. Back to you. Thanks very much. I want to now hear from Mr. Spurlock for the government. May it please the court, Matthew Spurlock on behalf of the United States. I'd like to start off with the end. And that is the issue of whether or not the authorities in Haiti, who are in charge of the prison system and the mental health system there, would specifically intend the harm that the petitioner, as the immigration judge agreed with, will be likely to experience in Haiti. I think the reason why it's important to start there, I'd also like to talk about the standards that Petitioner's Counsel mentioned as well, because I think that's incorrect also, but the finding of the board was regardless of whether the immigration judge's findings with regard to the findings of fact that led to that decision were clearly erroneous or not, even if they weren't clearly erroneous, the immigration judge was wrong strictly on the issue of whether or not the issue of intent on the part of the immigration judge be wrong when they're the fact finder and gets to be the one that determines specific intent. Because the findings, even if the immigration judge, what the immigration judge found was, based on essentially the status of the petitioner, which was he suffered mental health problems, he was a criminal deportee, and therefore he would likely be. No, no, no. Also, they're more likely to suffer violence. Prison officials and mental health employers are likely to behave violently against persons with serious illnesses. Because he has a problem with authority figures, he will be more targeted. It wasn't just those things. It was quite a number of things, right? Well, I can get back into what their specific findings were, and I would like to do that, and I'll come back to that. But the fact that the immigration judge found that their preliminary findings of fact to get to that specific intent finding, even if those were correct, which were mentally ill or potentially mentally ill, also was going to be a criminal deportee, didn't have family in the area, all of those things, the harm that he would have experienced in Haiti would have had nothing to do with that. It would have had to do with the fact that the economy, the existence of resources. I'm sorry, but the I.J. specifically said people with mental health issues are targeted in these places because people are fearful of them. People think that they're disordered. Is that fair? Is that a fair characterization of what the I.J. said? That's exactly what the I.J. said, but it's not backed up by what's in the evidence at all. The evidence overwhelmingly in the record says that the basis of whatever harm individuals that would be in petitioner, just like in the Pierre case, would experience in this situation, although maybe they do have other aspects of their health issues or those things that may make them suffer more in the prisons or the mental health system, there's no evidence whatsoever in the record that specific intent of the authorities in Haiti to cause pain or suffering that rises to the level of torture. I don't disagree that there's another reading of the evidence, but what I don't understand is if there's more than one permissible reading, why isn't there deference to the I.J.? I think it would be hard for your opposing counsel to say this is slam-dunk definitive evidence that he's absolutely going to be tortured. But the question is when there's two permissible views, why is it clearly erroneous for the I.J. to have decided the way that she did or he did? Yes, Your Honor. I would refer the court to its decision on Mu Lin because the issue is laid out very – we're getting back into the standard for clear error, and I think it's laid out perfectly there. The clear error standard for the Board of Immigration Appeals is less deferential than substantial evidence. So you're not – the purpose of this court isn't to determine are the I.J.'s findings more correct or are the Board's findings more correct. This court's just looking at clear error, and the only thing that it's looking for is whether there's sufficient justification on the part of the Board's decision to justify that clear error finding. But if we're looking at sufficient justification, doesn't that imply that the BIA did some fact-finding, which they're not supposed to be doing? I don't believe it does. And the court in Mu Lin went through that very carefully and explained there are times when you have fact-finding and you have what looks like finding clear error, and a lot of the language between those two things sound the same. But that's not what the immigration judge did in this case – I'm sorry, what the Board did in this case. The Board didn't go through and say, here are all the facts. As we find them, we don't agree with the immigration judge. They went through the specific findings of the immigration judge and stated with the immigration judge where they made error specifically. And one example of that was the finding of the immigration judge that the petitioner couldn't possibly receive the mental health care that he desperately needs because there's no evidence in the record whatsoever that there's – what his mental health needs could be. So you couldn't have a finding of fact that's grounded in the record if you don't know that. So the Board went through, said what the errors were, and then went through and said – and applied the correct standard. I have a legal question for you. I mean, it seems that the rule of the BIA is that if you have a sequential set of events, and each one is more likely than not, and let's say each one has a 60% chance of happening, by the time you get done with the third one, you're down to really a one out of five chance of the persecution or the torture. Is that the way it works? Is that still more likely than not, even if you get down to 60% chance of 60% chance of a 60% chance? It seems that that is the BIA's rule. I'm just asking if that is your understanding as well. In terms of whether or not the Board is supposed to just simply look at each individual factor and determine this one factor – Bill, I'm thinking of the IJ. It's the IJ who makes these decisions. If the IJ says this is more likely than not, and if that happens, then this becomes more likely than not. And if that happens, this becomes more likely than not. And if each one is 60% likely, at the end you have a 20% chance of torture happening. But it seems that that is the BIA's rule. Am I correct? Under JFF, which is essentially that if you have a chain of events, each event has to be more likely than not to occur, and then you also have to look at all the events in total to see if you still – in other words, even though one event – My hypothetical is 60%, 60%, 60%. You end up with 20%. But yet, for each link in the chain, it's more likely than not. Is it enough for the IJ to find that each link in the chain is more likely than not? Or does the IJ have to say that after you link all these things together, it's still more likely than not? I think at the end you have to say – I understand your question now, Your Honor. Yeah. When you get to the end, you still have to say – And where is that in the law? I believe – Where is that in the BIA's interpretation of the act? The closest I can think of would be the JFF case, the board's decision in JFF, which I don't have the cite for immediately before me. But I believe that is what lays that analysis out on the chain of events. And does that answer your question? Well, that deals with the chain of events. But the question is, at the end of the chain, when you multiply the likelihood of one thing by the likelihood of another and the likelihood of the third, do you still have to have a 51% chance of torture? And you're saying JFF is going to say yes? In the end, you have to decide at the end of that chain of circumstance, each more likely than not, the chance of being tortured is more than 50%. If I understand what you're saying, Your Honor – I'm trying my best, but I know it's complicated. Yes. If it's my understanding that that is correct, that they still have to do the – each chain of event in the series of chain events has to be more likely than not. If any of those events don't match more likely than not, then you don't have, at the end of the chain, even though there were others that were or could have been, you still don't have it. And your question to me, Your Honor, is at the end of that, if each one of those is more likely than not, can you at the end say it's not more likely than not? Yes. Well, no, I don't think you can. Now that I understand what you're asking, I don't think that's correct. So if each event is more likely than not, then it doesn't matter whether you discount each one by the other. The likelihood of torture is more likely than not, as a matter of law. If you're adding each – I think that is addressed, and I don't have JFF in front of me, Your Honor, but I think that – But what do you think JFF says? I think what it says is if any of the events in the – is that every single one of them is more likely than not. The question is, is at the end of that chain, does there have to be a finding that the consequence of that is that it is more likely than not that the petitioner will be tortured? I believe that's correct. From what you're saying – That's what the reg requires, doesn't it? I mean, the statute and the reg require that torture be more likely than not. Right. The events that might lead to a conclusion of torture can be considered individually, but ultimately the question is, has the petitioner proven that torture is more likely than not? That's correct, Your Honor. So – That's correct. I mean, it sounds like Judge Jacobs' question is as much a math question as a legal question. That would explain a lot, Your Honor. But it seems to me the legal standard is that torture is more likely than not. Correct, Your Honor. But if we add them all together, then – I mean, I have to do the math, right? But at some point you'd end up needing a 99 percentile for every single step before – when you start compounding percentages like that. I mean, is that – I mean, there is going to be some math problem, and I'm sure I will be able to figure it out. But it's the idea of, like, how many people and how many steps and how high it has to be. Like, I'm not sure – I think what's missing, Your Honor, is even though the immigration judge made, like, findings of facts on each piece, he's likely to be detained. He's likely – and I think I could go through – although I'm out of time. I think I could go through the record and show pieces where the immigration judge wasn't correct and the board was correct on that. But I think if there's any piece missing that is speculative on the part of the immigration judge, that isn't really more likely than not. And I think that's what you have here, that much of this was just pure speculation. That breaks the chain that breaks the more likely than not 51 percent. That alone does. So you don't have to worry about the math equation of it because you don't have to get there because I think there were missing pieces in the chain that the board found that the immigration judge made in finding clear error. But I would reiterate, at the end of the day, the board was correct in finding, regardless of the clear error issue, assuming that those findings of fact by the immigration judge were correct, the immigration judge's findings don't satisfy the petitioner's obligation. But at the end of the day, the immigration judge found that each link in the chain was more likely than not and that it was more likely than not that he would be tortured. Right. So why isn't each one of those a finding of fact? Well, I think that was, I think that, I think first of all that each of those findings of fact had problems and they didn't necessarily lead to the conclusion that the immigration judge was suggesting, which was. Does it necessarily have to lead to the conclusion that the immigration judge arrives at? Because the immigration judge is a finder of fact. Well, the immigration judge rejected the specific intent element, really not based on a factual distinction at all, but based on their reliance, which was a legal error on de la Rosa and using the acquiescence aspect of the acquiescence analysis instead of the specific intent analysis. And as this court suggested, or this court specifically said that should not occur, they conflated those two, acquiescence and the specific intent issue. All right. Well, thank you, Mr. Spurlock. Got our money's worth out of you. We'll now hear from Ms. Perloff-Giles, see how her math is. Thank you, Your Honor. To begin, I just, I think it bears emphasis that the question is whether the BIA found clear error and not whether we would agree with the IJ's factual findings if we were reweighing the evidence or if the BIA were entitled to make its own factual findings. With respect to the math, I think it is also important to note that there's an additive process as well of all of the different risk factors, and so you can think of that as multiple chains. And my friend on the other side mentioned acquiescence. That's, of course, if you're looking to private actors, and there's evidence in the record about stonings and burnings to death of people who are perceived as mentally ill. We don't even need to reach that because the IJ found that government officials, correctional officers, and police intentionally, physically abuse people in their custody. And again, I don't think this is a long, hypothetical, speculative chain. I think they're really just those two questions. And with respect to both, the BIA cherry-picked it from the record, decontextualized it, and ignored record evidence. For example, the BIA found that there couldn't be a likelihood of detention because not, quote, all deportees are detained. Again, that's not the question. It's not whether all are. It's whether people who are similarly situated to... I thought there was an issue as to whether the United States government had intervened and that Haiti had changed its policy. Am I wrong? So, there is more recent country conditions evidence as recently as November 2022. There was a big article about the continued detentions, but obviously that's not in the record. The point is that some people, and that's, I think, the government can see this much. The continued detentions of? Continued detentions of people who are mentally ill, people who are criminal deportees with drug-related convictions. Both of those are supported in the country conditions and are consistent with... Well, why wouldn't a country want to detain somebody who was deported as a drug dealer or deported because they are a child molester or because they are a rapist? I mean, why wouldn't a country, at least preliminarily, want to detain somebody and not just release them into the population? So, I think this court has addressed the lawful sanctions issue that I think Your Honor is getting at in both Pierre and in Kazim versus Ashcroft, that it would completely eviscerate CAT if we said that anyone with a criminal record is allowed to be indefinitely detained when they've served their time in this country and then they're deported to Haiti. And again, the point is that they're subjected to intentional physical abuse conditions that this court noted in Bellazer versus Holder, that prison authorities intentionally mistreat mentally ill criminal deportees whom they believe are under a curse or spell. And I think that's also what distinguishes this case from some of the other cases in other countries, is that in Haiti specifically, because of the voodoo culture, it's all in the country conditions evidence that people who are perceived as mentally ill are particularly targeted and subject to different forms of abuse. And so, for all of these reasons, as Mr. Auguste himself said in his letter to the IJ when it was on remand the first time that the BIA was allowing these findings of fact to fall on deaf ears, we think the same thing happened the second time and we would ask this court to vacate and reinstate the IJ's decision. Well, thank you, Ms. Perloff-Giles, and thank you, Mr. Spurlock. We're a reserved decision. And Ms. Perloff-Giles, you guys are appearing pro bono on this one, I think. So thank you for doing that. We greatly appreciate it. Thank you. Our final argument of the day is Ibarra v. City of New York. Thank you so much. All right, good morning, Mr. Ibarra. Am I pronouncing your name right? Yes, sir, Ibarra. You didn't roll the R, but that's okay. Say that again? You didn't roll the R, but that's okay. I can try. I'm probably a better, more eloquent than Galey. Mr. Ibarra. Ibarra. Ibarra. All right, Mr. Ibarra, you have five minutes, but you reserved one minute for rebuttal. So that gives you four minutes out of the game. You may proceed. Okay. Thank you. I please the court. I please the court. My name is Natanya Ibarra. I'll start with police is not a noun, it is a verb. The police have the duty of maintaining law and order. The police are the guardians of public safety and is a duty that runs to all the public equally. The accusers, certainly, but also the accused. The police must, therefore, be reasonable. The police must, therefore, act in good faith. Your honors, my case is about a failure of that role. On March 9th, 2016, I was at Grant Associates. It was a job placement center, and there was a young woman walking. She's walking along, and she just abruptly stopped. So I was walking behind her at some point, but not directly. I stopped, too, with my hands up. So this is a maneuver, an avoidance maneuver. So I kept going, and apparently she kept going. But as I moved on, two male staff members accosted me and said, we saw what you did. I asked, what do you mean? They said they didn't know. Rather, they said, you know what you did. So they became aggressive, verbally, and heated. So I myself called 911 for assistance. But can I just say, I mean, the issue here is whether the police officers had probable cause to arrest you, right? And so there were two witnesses who said that you touched or accosted the complaining witness, right? Yeah, that's what they said. Well, that's what they said. Right. And our case law generally says that police officers don't have to do much more than listen to eyewitnesses, unless they have some reason to believe that the witnesses are not reliable. Is there some reason in the record that suggests that these witnesses were not reliable? That the police should have been aware of? Well, I'm actually calling the police on them so their job is actually at stake. So I think they would be defensive. But when the police did come, they actually intercepted the police, and I didn't know they were there. So when I finally talked to the police myself, I identified myself as the person that needed your assistance. And the police just pushed past me and said, we don't want to talk to you. We only want to talk to the lady who wasn't in the building at the time. So they pushed past me, and I go running behind them to try to get them to address me, and they would not talk to me. So I moved past that to say there was a video when the first set of policemen came. There was a video in which the staff member offered, and they were looking at the video. This would eventually go to a court. No, no, no. But before the arrest, they reviewed the video? Is that what you're saying? Yes. Right. They reviewed the video. It's the same video that would eventually have to appear in court that the judge's name was Justice Pandit Durant, who ruled that there was no contact at all. So it kind of makes you wonder, well, what are the police looking at? Let's say for a minute, sir, that we disagree that the video is clear about what it shows or it doesn't show. Do you have any other argument for why there was no probable cause, or is it all on your video? It's mostly on the video. There were witnesses that would have corroborated my side, but the police wouldn't talk to them either. So their testimony isn't included in the record, and it's kind of unfair. So can I ask another question about, you made out a 1983, or you alleged a 1983 claim, and one of the things that needs to be shown in a 1983 claim is a policy or custom. And so if you could explain to me what you think the policy or custom was in this case that we should be concerned about? You mean in terms of, if I'm understanding your question, the policy and custom of the... Police that we should be concerned about, yes, sir. My understanding is that they are to do an investigation, not a huge investigation, but you generally talk to both sides. They get a picture of what is going on. Not to address the person that is in distress or feels he's in distress would not be a demonstration of that, would not be a demonstration of acting reasonable or being in good faith or acting in good faith. I need your help. You can't go past me and go to someone else when I'm addressing you for help. That's a little unfair. So now we're waiting for the person to come up. They're not even in the building, so we're waiting 45 minutes. And they still wouldn't address me. They still wouldn't talk to me or take any statement. So I'm getting a little nervous. The first set of policemen now call another set of policemen for supervision and for dispatch a supervisor. So this is an escalation that is not reasonable. It's an escalation that isn't fair or isn't in good faith. So- You're alleging that the police officer has acted inappropriately. Yes, yes, sir. To get to Judge Perez's point. Yes, sir. How is this, what is there in the record to suggest that this is part of a larger policy or custom of the police department? They have been known to, they are given a wide girth of discretion. And so they have the option, apparently, to talk to individuals that they feel they ought to or not talk to individuals that they feel they ought not to. And then they would probably claim, I don't know what we're looking for. They would probably claim probable cause, even though they didn't talk to either side. All right. So I see you're over, but you've reserved a minute for rebuttal. So let's hear now from Ms. Fillo on behalf of the defendants. Good morning. Mackenzie Fillo for the city. This court should affirm, as Judge Perez noted, the plaintiff hasn't identified any policy that allegedly caused him to be falsely arrested. All he's alleged is that the police, the city negligently, was negligent in training police officers. And under Monell, that's just not enough. Can I ask, isn't my own experience when I've had to call 911 is that I have been asked to stay there so that I can give a statement? Isn't it unusual to not speak to the complainant if they're physically present? The record doesn't reflect whether that's unusual or not, but the facts were really undisputed. He himself in his complaint alleged that he made contact with her. The question really was just about intent. He says it was an accident. She said it didn't feel like an accident. That's not something that can be resolved by talking to him. Whatever he said, they still could have arrested him. There's probable cause when a victim says he rubbed against me. What if we decide that the video was conclusively exonerating? Is there still probable cause? If the court believes that the video is completely exonerating, perhaps there wouldn't be probable cause. But there would still be no claim against the city here because there's no city policy. He's alleged only negligence. And negligence is not enough. He hasn't sued the police officers themselves. He's only suing the city. If his claim is about training, he has to allege and prove deliberate indifference. That is a very strict standard that this case doesn't come anywhere close to meeting. But the video is hardly exonerating. It shows that they bumped into each other. As he himself alleges, he told the 9-1-1, the 9-1-1 tape is in the record. He told 9-1-1, I bumped into her, but it was an accident. The video he alleges in his complaint, I bumped into her, but it was an accident. Again, whether it was an accident or intentional, it's not something the police can know for sure. There's always going to be some level of guessing when it comes to intent. And, of course, the probable cause standard doesn't require any kind of certainty and certainly doesn't require the proof beyond a reasonable doubt. We can't be in a position where, I mean, it was certainly, I think you would concede it was disruptive and hard experience. And where are the confines between when the police can do whatever they want, disrupt somebody's life, accuse them, arrest them, and when they need to at least do diligence of talking to the complainant? Like, where is the line in between there in this circumstance? This court has said repeatedly that once they have probable cause, they're not required to investigate further. They have video of them bumping into each other. He concedes he bumped into her. She said he rubbed against me. He concedes now, I guess the issue is really what happened at the time of the arrest, right? Sure. Isn't that really where we're focused? Yes, and they have- So at the time of the arrest, I mean, he hadn't conceded anything. But at the time of the arrest, there were two witnesses who said that Mr. Rivera, a constant, touched the complaining witness, right? That's right. And actually, when he called 911, he did say, I bumped into her, but it was an accident. So he even then was conceding that there was contact that day. And then they had the video, which does seem to show that there was contact. And is the record, which I wasn't clear on this, the record shows that the arresting officers reviewed the video before they arrested Mr. Rivera? The plaintiff testified to that, yes. And then as he noted, they called their supervisor. They got approval from someone else to make sure that they weren't going beyond the bounds of probable cause. They had multiple people saying, he touched me. I mean, unfortunately, gropings happen all the time. It's a crime of opportunity. It only takes a moment. There's no way they could have known for sure whether he did it on purpose or not. But the complaining witness said, he rubbed against me. It was wrong. And they were entitled to rely on that. They had no reason to think she was lying. Thank you. Thank you. Mr. Rivera, you have a minute of rebuttal. Thank you. Regardless of what is said by the opposing counsel, the video does not show any contact at all. The video was reviewed by the following court under Judge Pandit Durant and ruled that there was no contact at all. And that should stand. It should suffice. My understanding is, under the law of the case, it's not even supposed to be held for review, if I got that right. So, if the first court thinks there is no contact, it even rules me out. But, I mean, according to Ms. Fillo, you said in the 911 call that there was contact. That you, during discovery, during It was a crowded hallway, and there's people going everywhere, and I just stopped and just kept moving. So, if the moment is fast, it may have seemed that way even to me. But the point remains is that the court that was to review the video saw nothing wrong. And I don't understand what the No, no, but the court that reviewed the video, I mean, so the charges were dismissed against you. Yes. The issue is whether the arresting officers knew that there had been no contact or reasonably should have known that the statements being made by these witnesses was false. I think that's the case. I mean, they were looking at the video. I have it with me now. And they're looking at the video, and you could only see me doing this. It's a defense maneuver. My hands are up, so I don't want to touch the individual. So my hands are up. And so I'm not. And I'm on one side. The person's on the other side. So never direct me behind her. And it's a clear view to my body. So beyond that, it's like, it rather is not reasonable. It's not in good faith, and it's not reasonable. You can look at the video. And I'm asking you for help. I, myself, am the first responder. And I'm also a medic with New York State Military Forces. And I'm an officer. And as a medical officer, never have I had been accused of anything like this. And I've examined women before, female soldiers, and civilians, and never an issue. And I've been serving for 15 years. Now, I call that an announcement. The issue here is whether or not the officers acted unreasonably. I believe so, sir. Yes. Whether they were not justified in concluding that there was probable cause. Yes, sir. I think that's the case. Because it's pretty obvious, according to the video, with me moving fast and she's moving fast and I'm reacting. It only seems that way. But when I looked at the video, there was no contact at all. It really shouldn't be an issue. All right. So we will reserve decision. Thank you very much. Thank you. That concludes the arguments on today's calendar. There's one other case, United States v. Lemke, which is on submission. We'll reserve on that as well. And so with that, I'll ask Ms. Beard to adjourn the court. Thank you very much and good day. Court is adjourned. Thank you.